Good afternoon, or good morning, rather, Your Honors. I think we're still on the clock. Yes. Philip Trevino appearing, may it please the Court, on behalf of Defendant Appellant Stoddard. Good morning, Your Honor. Michael J. Trenman appearing on behalf of Mr. Dowie. We split our time up between us, and Mr. Trevino will go first. We've divided the time approximately in half for each of the two defendants. So why don't we do this? Why don't we put ten minutes on the clock, and then that way you won't be tempted to go over until his time. Oh, Mr. Trevino and I know each other. He'll pull me aside if I do. All right. Please proceed. Listening to the last case on the Court's docket, I was in very comfortable familiar territory as a criminal defense attorney in the federal court system, because that's the type of federal criminal fraud that I've been used to seeing. This case I find distinct, and I don't know that perhaps this panel will as well. It certainly is my view that individuals with no prior criminal history who are very highly regarded in their professional arena, who engage in activity which is open, clearly well-known, not only within their own local office but even at the national level, who secure no profit from the activity at issue, and there's no loss to anyone that has as yet been clearly established. There have been putative findings but highly disputed at various points. All strikes me as a very unusual constellation of facts. I'm in the further uncomfortable and very difficult situation standing before this Court, in that in the first time, at least in my experience, I need to immediately draw the Court's attention that all the briefings complete and don't feel this matter is prepared to go forward. And the reason for that is because of the various rulings that have been made initially by this Court and then subsequently on a remand to the District Court and then again upon renewed motion to the Merits Panel of this Court for funding to investigate a critical witness, Monique Moret, in regards to events that the defense learned after the trial and only after these appellate proceedings were underway, very likely gave her a very clear and stark incentive and motive to fabricate the testimony she offered to my client's jury. That's just a speculation on your part. Well, it's not that it's given that there is an assistant U.S. attorney who made the statement that Ms. Moret's father was considered by the same U.S. attorneys, same division within this U.S. attorney's office, to have criminal exposure at the very same time that Ms. Moret was cooperating with the government in this matter. It may well be, Your Honor, that after investigation, it may prove to be speculation. I don't believe so. I think we have a good faith basis to believe that quite the contrary. But what we don't have and haven't had is the opportunity to establish it one way or the other. We made timely motions as soon as the information came to light. We procedurally proceeded with them, presented them to the District Court, and at every juncture so far, funding has been denied. Well, if somebody wants to get impeaching evidence against a witness, why do they need a CJA appropriation for funds to do the investigation? Why can't they just go and investigate and see what they can find out? Well, Your Honor, because there are rules, statutes, that require prior judicial authorization for such expenditures. I am under appointment by this Court, as is my counsel for the co-appellant. We are compelled by statutory authority as well as by Title VII of the Judiciary Guide to CJA Policies and Procedures to comply with those practices. And key here is the fact that we're required to obtain judicial approval in advance to incurring that kind of an expense. So you had an investigator for the trial? You had an investigator? I did not, Your Honor. I did not represent Mr. Stoddard before the District Court. Well, whoever his attorney was had an investigator. He had retained counsel at that point, Your Honor. And so those funding questions were all private matters. Okay. So this arose after the case was finalized. That's correct, Your Honor. You were appointed for appeal. That is correct. So I'm under appointment now before this Court. I have been since the very early stages of this appeal. Well, why wouldn't this be sort of, if there was something, not just speculative or cumulative evidence, but something substantial, why wouldn't it be a proper habeas post-conviction remedy rather than trying to piggyback onto an appeal? Well, the first of the... You're looking at alleged errors in the trial and in the sentencing, which are the two phases that are in the record. And we have a record and can examine all those issues. But on this thing, this is like, sounds like the kind of stuff we get in the District Court in habeas. Well, the most immediate response to that, Your Honor, is post-a-depa, the Anti-Terrorism and Effective Death Penalty Act. There is a timeline that controls. And once the evidence that came to our attention was disclosed by the government, there are various clocks that are running. We were still able to comply with the statutory guidelines, statutory time frame provided for motions for new trial under Rule 33, and we attempted to. We did present our motion timely to the District Court. And we're hopeful that we could preclude even the necessity for this appellate proceeding to go forward. Unfortunately, that's not been the result because of the denial on the request for the funding. The basis for that and the authority for it and the analysis were all submitted to this court in an under seal, actually in multiple under seal in-camera submissions. I understand the government has requested disclosure of those. We object to it because if that investigation does go forward, we consider those sensitive areas which could be dramatically affected by opposing counsel's awareness of how we intend to or at least hope to approach the topic. If there are no further questions on that point, I'd like to move to the lieu instruction, which we consider, based on the record that we do have, to be a crucial one. I understand the reasons the government points this court to Judge Feist's finding in his minute order that there isn't a difference between the Department of Water and Power and Los Angeles itself. But I have to very respectfully disagree both with the government and also, unfortunately, with the district court. That's a finding of fact. And the case law of the United States Supreme Court and certainly this court as well are very clear that such findings can only be made by the trier of fact. DWP is unique. It is, my understanding, it is the largest utilities municipality in the nation. And what was at issue here, this fight, was distinct also because of DWP's independent contracting power and because of the way in which these bills were generated and presented for payment. So you're not saying it's wrong to treat them as one and the same. You're saying it was for the jury, not the judge. Correct. It may be that that could be the appropriate conclusion the jury would reach after having been correctly instructed. But it's very clear from this record the jury wasn't given the opportunity to do that because the requested jury instructions were denied. Lew remains good law in this circuit. It's been followed by a number of panels. Lew would, in effect, have given a verdict in your favor. Yes. Under that decision, my client would have prevailed. The government points to out-of-circuit authority in the hope that this court may determine there's been no problem or no prejudice. I respectfully disagree with them since this court has directly binding precedent that we ask the court to follow. And although the government points to other circuits that have differed with Lew and distinguished it, as this court's research probably has shown also, there are other circuits that have followed this court. So it doesn't stand alone in its holding in Lew. I have noticed that I have just a limited amount of time left. Unless the court has other questions for me now, I'll reserve the remaining time and allow my co-counsel to begin this presentation. Thank you. Thank you. Counsel, with the Court's permission, I would cease to reserve half of my time for purposes of rebuttal. And I would address the sufficiency of the evidence argument that we raised on behalf of Mr. to the issue of the wire transmission or the absence of a wire transmission as an element in this case. The facts briefly are that at the Los Angeles level of Fleischmann-Hellert, the company prepared information about billing. That billing information was in turn transmitted to another branch of the same company. As a result of that transmission, certain, if you will, worksheets were created and sent back to the local office for review. That process still hasn't gotten to any wire transmissions. At the local offices, Los Angeles, there are modifications made to the blue sheets, the worksheets. Those modified sheets are in turn sent back to a regional office for processing. Again, that transaction is not alleged in the indictment or in the facts of the case to have been any wire or mail transmission. What then happens is that the information is correlated at the, in this case, St. Louis branch of the company. And that branch of the company does two things, only one of which relates to the elements in this case. And the thing that relates to the elements of this case is it downloads a Microsoft Excel spreadsheet to the Los Angeles office. That downloaded document contains, if you will, the entirety of all the information that has been put together for billing purposes. But it is not transmitted outside of the Los Angeles office. It is used instead to create yet another document, which ultimately is provided to the Department of Law and Power. It is the download of the Microsoft Excel spreadsheet that the government contends and indictment contends represents the wire transaction in this case. We submit under the United States Supreme Court authority that we have cited that that doesn't qualify. And the reason why it doesn't qualify is because it is not incident to, or if you will, it is not connected to an essential part of the scheme. Because the only transmission is from one branch of the company internally to another branch of the company. That's the transmission. And the nature of that transmission, whether it had been couriered, whether or not it had been carried from one room to another, whether or not it was downloaded from one computer to another, was not related in any fashion to what is alleged to have been the fraud in this case. So, counsel, did you make this argument to the district court? Yes, Your Honor. And the district court, was it in a motion to dismiss? It was made in connection with a couple of different motions during the trial, including motions for judgment of acquittal at the end of the trial. Although I was not the trial counsel, the record does reflect the making of those motions. So the issue was specifically brought to and denied by the district court. So your reading of the record is that this was the only transaction that the government relied upon as the wire transaction in this case? It is these transactions having the same process having occurred more than once. Right. But the download of the spreadsheet was the only wire transaction that was argued by the government. The multiple downloads. Yes, Your Honor. These things were sent by e-mail, weren't they, back to St. Louis to Heckman? The billing information was sent by e-mail, wasn't it? Again, that's why I sort of went through the facts. It depends on which billing information we're talking about. The initial entry by employees was done into a computer program, which was available at the St. Louis office to be used to create the blueprint. Did it get from point A to point B? It doesn't matter that it was wireless, because a lot of the Internet is not actually on the wire. It's wireless, but aren't the cases holding that whether it's an actual wire connecting the two places or whether it's wireless is the same thing? And that's not the distinction that I'm making. The only way you could beat the old mail fraud statute was to hand carry it around to the other people. The initial creation of documents, from my view, is done electronically at the local offices all across wherever those offices may be for the parent company. And whether or not the parent company has its own internal network under which those are transmitted to St. Louis, I can't anonymously answer the Court's question about that. But the government did not allege that to be a wire transaction? That's correct. The transaction that is alleged to be the violation of the statute in this case is the download transaction of the Microsoft Excel spreadsheet. In the St. Louis office? From the St. Louis office. Transmitted to Los Angeles. Correct, Your Honor. So Heckman creates a billing worksheet in St. Louis, emails it or downloads it to the West Coast, where an activity report is dummied up, to use another phrase. Why isn't that transmission part of helping execute the fraud? Because the nature of the transmission, how it's transmitted, the wire aspect of the transaction doesn't make any difference. To the commission of the fraud, who cares? So what case was an element of the fraud? It was an element of the fraud. It's how the process worked. It's how the worksheets were dummied up. It was an integral part of that. And the distinction that I believe the Supreme Court makes and that I'm making is that it isn't just the transmission of fraudulent information. Let's just go from that position. Right. That constitutes a violation of the Federal statute. Right. The wire in this case has to play a role in the commission of the crime. And you're saying it didn't play a role? No, I'm saying it did not play a role. It had no integral, it had no touchstone relationship, however you want to define that concept, to the commission of the crime. So your argument is the method of communicating the information to the L.A. office did not play a part in the fraud, and so it couldn't have been wire fraud? Is that your argument? Yes, Your Honor. It was not incident to an essential part of the scheme, and by that I mean the use of wire using, Your Honor's broad concept, for the purposes of the download. Because your argument is because they could have transmitted the, theoretically they could have transmitted this information in a number of ways. The fact that it was done by wire doesn't make a difference. And it was all internal within the same company. So you have an internal transmission, and how they elected to make this transmission or this communication from point A to point B. Now tell me what Supreme Court case you are relying upon for that argument. The Schmucknick 489 U.S. 705. It's cited in both of the parties' briefs. The fact that it's internal of significance to your argument? I'm confused there. Or is it the fact that it wasn't a key role in the fraud? I think it's both because you have to look at the nature of the circumstances under which the transmission is taking place. In other words, it made no difference, if you will, to the final dummied-up product, to use Your Honor's concept, how it got there, whether somebody had walked it in, whether it was somebody in the cubicle. I mean, think of the concept from in the cubicle, next door. The fact was it was e-mailed. It was downloaded. It was sent that way. It wasn't hand-delivered. Right, but it didn't make any difference. And unless it makes a difference, how do you why does this become a federal trial? Counsel, could you tell me the language in Schmuck that you're relying upon to support your argument? I believe that the opinion talks about the precise page. All right, Your Honor. I don't read it that way. This is a mail fraud case, and, of course, mail and wire fraud cases are considered to be instructive for each other. But I'm looking at page 711 of the U.S. 489 U.S. 710, and it says, To be part of the execution of the fraud, the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot. And that's the language I'm relying on, because my point is, is that the commission of the scheme, the nature of the transmission, in that case mail, doesn't make any difference. It's not essential. Yeah, but the case says it doesn't have to be essential as long as it is a step in the plot. And this was a step in the plot. It has to be incident to an essential. That's the language. Or incident to an essential part or, alternative, a step in the plot. And it wasn't a step in the commission of the scheme. There was no aspect of that step, use in this case of wire or use in that case of mail. That was a step in the scheme. It didn't have to mail the information that we're talking about in order for the information to be transmitted from St. Louis to Los Angeles. And so the question is, what's the nature of the incident? And I think the answer is, the nature of the incident is that it had nothing to do with getting the information ultimately to the Department of Water and Power. I understand your argument. Thank you. All right. We'll hear from the government, and then we'll give you a minute for rebuttal. May I please? Thank you, Your Honor. May it please the Court. Cheryl O'Connor on behalf of the United States. I'd like to address the issues raised by defense counsel here, particularly the investigative funds regarding Ms. Moret and her father's supposed criminal liability in the Southgate case. Not only is defendant's position completely speculative because we don't know whether Ms. Moret was aware of her father's predicament or not, but even if you assume an investigation is conducted and finds facts that are favorable to the defense that could have been used to impeach Ms. Moret, the district court was very clear that it would have treated those facts as cumulative, that based on its view and listening to Ms. Moret's testimony, Ms. Moret was cross-examined for three days. The most crucial part of the cross-examination was that she was there to save her own skin, not save anyone else's skin. And so even if this information had been available, it would have been cumulative. It would not have had any effect on the outcome, and it doesn't provide any basis to undermine confidence in the jury's verdict. I'd also like to correct a factual mistake. So you disagree with your opponent's brief that this information was critical and would have, quote, changed the entire course of the trial? I completely disagree with that, Your Honor. And there's a misstatement in my opponent's reply brief wherein he states that Ms. Moret's father's situation was pending at the exact same time that she was testifying. That's not the case. Mr. Moret, Lou Moret, was never charged. The charging decisions had been made. The Southgate case had been completed in a public trial at which Lou Moret testified without any grant of immunity as a mere witness. So at the time that this case went forward, there would have been no concern to Ms. Moret about any liability on behalf of her father.  Was the Southgate trial over by then? Yes, the Southgate trial was over, and Lou Moret had testified nine months prior to the trial in this case. I'd also like to address the Lou instruction. Again, I am completely at odds with my opponent's representation here. A Lou instruction would not necessarily have resulted in the defendant's favor here. But the district court was correct in not giving the instruction because under the fact of this case, the instruction simply wasn't supported by any evidence by which the jury could have made the findings that the defendant thought was at issue. This case is very distinguishable from Lou. In Lou, you had a defendant who was making misrepresentations to a government entity and seeking money from his immigration clients, on the other hand. There's no possibility that the misrepresentations that that defendant was making satisfied one of the elements of the offense, which is that the statements were material and that they would have reasonably induced someone, which would have had to be in that case the government, to part with money. In this case, that's not the case at all. All of the evidence, which was overwhelming in this case, demonstrated that the defendants made false statements to Fleischman-Hillard clients with the intent of obtaining money from Fleischman-Hillard's clients and that the statements were false statements in the bills, which were precisely of the type that would have caused the clients to part with money. So whether the City of Los Angeles cut the check or the Department of Water and Power cut the check is really simply a bureaucratic accounting matter. There's no dispute that it was Department of Water and Power funds that were at issue. Moreover, the two parts of the record to which the defendants cite in support of this instruction don't in fact demonstrate that payment was coming from a separate entity. Mr. Howard stated, I believe, that it was a two-part process, and Ms. Nagano from the Port of Los Angeles stated that it was the port's money that was being paid, which by analogy is the same as the situation with the Department of Water and Power. I'd also like to address the sufficiency of the evidence with respect to the wire, and I think Your Honor is exactly correct that Schmuck in fact supports the government's position in this case. Here, the use of the wire was in fact an important part in the plot to deceive the clients. Do you agree with opposing counsel that the only possible wire transaction in this case is the download of the spreadsheet and transmission to the Los Angeles office? Well, those may not have been the only possible wire. Is that what was asserted by the government? That's correct, Your Honor. Those are the wires that were charged in this case, and so those are the wires that we have to deal with, but those wires were sufficient to establish jurisdiction here. What happened was the defendants and their subordinates in Los Angeles made handwritten changes, adding fraudulent hours to the billing records here in Los Angeles, transmitted those records to the corporate office in St. Louis. How? I think it was by interoffice mail, Your Honor, but I don't recall. But in any event, even if they were wired, that's not the wire that we're relying on. But the corporate office did two things with them. One, they compiled this spreadsheet, the download, which was emailed back to Los Angeles. They also created an invoice, and the crucial means of keeping the clients in the dark about the fact that they were being charged for hours that weren't worked were that the employees in Los Angeles then took these downloads and made up the activity reports. And where time hadn't been entered with an explanation into the system, as Ms. Morett and others testified, they often had to simply make up descriptions in the activity reports. And it was essential that the activity reports matched the invoices that had been provided to the clients. Otherwise, the clients would have detected that there was no support for the bill that was being sent to them. Your Honors, I'd also like to address the jury instruction regarding cooperating witness Stephen Sugarman. And the jury instruction regarding Stephen Sugarman's guilty plea was properly formulated. He was – the jury was instructed that his guilty plea was not evidence against the defendants, that it could be only considered for – in evaluating Mr. Sugarman's credibility, and that Mr. Sugarman and the other accomplices' testimony should be viewed with great caution. I'd like to draw the Court's attention to United States v. Carson from the Sixth Circuit, which is very similar to the claims of misconduct here in rebuttal argument. Did I have anything from the Ninth Circuit? Well, I have – The Sixth Circuit is good law. It's called twice as good. I'm sorry, Your Honor. We do refer to the Prowl case in our papers from the Ninth Circuit. But the reason I call the Court's attention to Carson is because the facts are so similar to the facts in our case. In Carson, the government's argument was essentially that if no crime occurred, what kind of deal has this cooperator received if he's come in and pled guilty to felony offenses where no crime occurred? It's parallel to the argument that was made in this case. And the Sixth Circuit evaluated it and first said that it wasn't misconduct in light of the way that the guilty pleas had been portrayed throughout the case and in light of the fact that the jury was properly instructed as to the use of the guilty plea. Similarly, in this case, although certainly in retrospect Mr. Kamenstein's argument could have been phrased better, I think it's a reasonable interpretation of his argument to say that it goes to the credibility of Mr. Sugarman, not only the credibility of Mr. Sugarman, but the credibility of the other witnesses that he listed. And if I could just recap for Your Honors, defendant – The problem with it is that, you know, if you're saying somebody pled guilty, it's kind of a hint that the crime was actually committed, which is to the detriment of the defendants who did not plead guilty. That's why I asked you, did you have a Ninth Circuit case? Because with all due respect to the Sixth Circuit, I'd be curious to know how our circuit has treated similar situations. Well, I wasn't able to find a Ninth Circuit case that has facts quite as parallel as in this case. But there are the Halbert case and the Prowl case which talk about the way that a jury instruction should be formulated. And here, I think that if the Court looks at the entirety, the – that the jury was properly instructed. It was a momentary comment in rebuttal. Even if the Court finds that it was an improper comment by the prosecutor, it wasn't objected to at the time. And so it's reviewed on plain error and it simply doesn't meet the plain error standard. And, Your Honors, I would point out that the fact that it wasn't objected to at the time is significant beyond the standard of review issue. It's significant because this was a highly contentious issue. This was a hard-fought trial. And no one in the courtroom at the time, neither of the six defense attorneys or the Court, viewed this statement or heard this statement as being made in an improper manner. But in any event, it wasn't a closed case. The instructions as a whole were proper. And in that regard, it just simply didn't affect substantial rights or affect the fairness or integrity of the trial. So you cited Prowl, which is a Second Circuit case, right? Oh, excuse me, Your Honor. Do you have a moment? Sure. Your Honor, I'm not certain that we have a Ninth Circuit case precisely on point here, which is why I would draw your attention again to the reasoning, although not persuasive, of the Sixth Circuit case. I knew I was sent here for a reason. There you go. If the Court has no further questions. Do you want to reply to the argument that there was a constructive amendment here and that there was a, quote, vastly greater and amorphous, quote, and, quote, during the trial than is alleged in the indictment? Yes, Your Honor. That simply is not the case. There was a single conspiracy alleged in the indictment, and a conspiracy among the defendants and others, to defraud Fleischmann-Hillard clients of money belonging to Fleischmann-Hillard clients through false statements made on the billing records. And that's exactly what the government proved in this case. The government confined its evidence to specific Fleischmann-Hillard clients. The defendants cite to the platinum equity and Kojima e-mails as an indication that the government introduced evidence outside of the charge of conspiracy. But that's simply not the case. For one, those e-mails were introduced to establish the defendants' knowledge, not to establish that there were – that – not to establish anything specifically regarding those two clients. And, in fact, the government didn't argue in closing anything regarding whether or not those clients had been defrauded or had been part of the victims of the conspiracy. And so for that reason, there was no indication in the record that the indictment had been amended. Moreover, Your Honors, the jury was given a multiple conspiracies instruction. The court stated that although it did not believe that there was more than one conspiracy proved at trial, but it would give the instruction anyway, and the jury rejected that argument properly. I have one last question for you, and that's with respect to the Thompson memo, which has not yet been directly addressed by the Ninth Circuit. Is it your position that the fact that the Thompson memo was mentioned as a factor by the district judge who felt it did not require a different ruling, does the fact that it was a factor require a reversal, or is it – does it necessary that it be the primary reason? What's the government's position on how the Ninth Circuit should treat the Thompson memo? Well, Your Honor, the government strongly believes, as the district court believed, that the Stein case is simply wrongly decided. And so the Thompson memorandum doesn't provide a basis for the underlying issue here. It certainly doesn't provide a basis for dismissal of the case. So we can decide this case without addressing the Thompson memo? You definitely can, Your Honor. And even if the court were in alignment with the Stein case, the facts are so dissimilar here that there's no prejudice to the defendants. There was no prejudice because although Fleischman Hillert eventually stopped paying the fees for Defendant Dowie, it did so for reasons unrelated to the government's conduct. And the same attorneys continued to vigorously represent Defendant Dowie to the extent that the best defense that money could buy was essentially the way that the district court summarized it. So, number one, the court doesn't need to address the issue. And, number two, even if you do, the government still prevails.  Thank you, Your Honor. Thank you. Rebuttal. I'd like to immediately address the assertion that there may be some misrepresentation in Mr. Slaughter's briefing. The court has before it a motion on the court's docket, document number 58, which was the motion by which Mr. Slaughter sought the remand of the district court, which detailed extensively the timeline on the Southgate matter and this matter and how the two matters were interwoven chronologically during their pendency in the district court. And that matter was then referenced, that submission was then referenced in the open briefing in this matter. So, I have to disagree with my opposing counsel. I consider those points clear. They're a matter of easy judicial notice for this court to take by reviewing the district court dockets in both matters, and I provided the court previously with the docket numbers on that other matter. As far as government counsel's view that any impeachment of Ms. Moret would be unmeaningful to Mr. Slaughter, I most respectfully and categorically have to disagree. Well, that's what the district court determined. Absolutely. And I understand exactly why Judge Feist said it. I consider him a measured, reasonable jurist. From what he had in front of him, that was a reasonable understanding for him to take of this witness. And that's the reason that we'd like to investigate, because it's our view what Judge Feist had was not the real story. And the real story is what's still out there. Those two matters were intertwined, and I consider it an extraordinary coincidence, if that's what one chooses to characterize this as, that not just the same U.S. Attorney's Office, but the very same division within the same U.S. Attorney's Office has father and daughter in its crosshairs at exactly the same time. A review of Ms. Moret's statements given to the FBI, and this is detailed in the submission made to this court that I referenced earlier, docket number 58, a review of those FBI 302s shows an evolution in her statements to the FBI. She initially has no acknowledgment or indication or reason to believe that any of the conduct in which she engaged or those others, including my client engaged at Fleischman, was criminal. And then suddenly there is a change, and the FBI 302s start to reveal that she's making different statements. Now, all of a sudden, she's got an awareness post hoc that all of that was, in fact, criminal in nature. She is... The evidence says she was saving her own skin. That... You've seen that before, haven't you? Absolutely. And she had an immunity agreement so that her own skin was safe. But her father wasn't under her immunity agreement. He'd already been tried. That trial was over. He wasn't indicted in that trial. The trial that he testified. He testified. He yet could have been indicted. He yet could have been exposed to criminal liability. In fact, these defendants were not made aware of. But the government, and my opposing counsel stands here and says this asserted criminal liability. I'm sorry. The assertion is made upon a statement made by Assistant U.S. Attorney or former Assistant U.S. Attorney Lee Ahrens, as is provided to the court in the materials before it. So it isn't that we've concocted this out of thin air. It's we didn't know it until Mr. Ahrens disclosed it publicly. So it's a very grievous disclosure and one certainly my client should have known about during the pendency of his trial. And had he known about it and used it when Ms. Moret was on the stand, I respectfully submit to this court, Judge Feist would never have made that statement because he would not have possibly formulated the same view. I realize my time is out. If the Court indulges me for one moment, I would like to address the Sugarman instruction, my opposing counsel. It may not be of any moment to the government. It's a great moment to Mr. Stotter. Mr. Sugarman held the same position, albeit years before, that Mr. Stotter later held. And that instruction, as this Court noted in its questions of opposing counsel, left open the insinuation or cast open the insinuation that, in fact, crimes had been committed. And that was the very point that Mr. Stotter vigorously was trying to disprove or challenge before his jury. So when the district court instructed that jury with that instruction that Mr. Sugarman's guilty plea effectively admitted there had been criminal activity, Mr. Stotter's defense was eviscerated. Well, the problem is, as opposing counsel pointed out, if this was such a dire negative happening, why wasn't there any objection to it? There was. There was a request for different instruction. And that's why we were before the Court with that instruction. Oh, I thought you were talking about the statement that the government made about the guilty plea, because that was intertwined with the instructional request. The instruction was submitted by the defense, which would not have allowed that problem, that confusion, to go to the jury. And that instruction was denied by the district court. But my question was coupled with the statement that was made by the jury. During closing argument? Uh-huh. I don't have a crystal ball to go back in time and answer that question. I don't know what went through trial counsel's mind. All right. Thank you. Thank you, Your Honor. Rebuttal. I'd just like to clarify two issues, if I may. One of them has to do with the timing with regard to the interaction between Ms. Moret and her father in the United States Attorney's Office. While the trials related to them take place at different times, the negotiations leading to both Mr. Moret's testimony and the agreement with regard to his daughter are taking place during the same time before either of those trials take place. Counsel, is there anything in the record that expressly addresses negotiations between Mr. Moret and the government? Yes, Your Honor. It's contained in the ‑‑ I'm sorry, I don't have the docket entry, but it is contained in the district court filings that we made seeking both authority and a new trial in the district court. I made those filings, and I happen to have been counsel at the trial level. So what was known about the negotiations with Mr. Moret? That they were taking place during the same time period, as later we learned the negotiations were taking place with regard to his daughter. And the negotiations with Mr. Moret had to do with his willingness to cooperate with the government in the case that they were ultimately going to proceed with, in which he did ultimately testify. So we have the same people in the same place at the same time negotiating their own respective arrangements with the United States Attorney's Office. And the second point that I wanted to address, I didn't want the court to be confused with counsel's comments about the invoice and the activity reports. Neither of those documents are alleged to have in any way been part of the wire transactions that are the subject of the scheme in this particular case. The only transactions, as counsel acknowledged, are the download. And the testimony about the download from the woman from St. Louis who made the downloads or oversaw that process is that it didn't make any difference. It was a convenience to her as to how that information was conveyed from one branch to the other. You will concede it was a step in this multi-step process. No, I don't think that it was a step. I think it was completely irrelevant. And that, I think, is the reason why the Supreme Court, in the opinion that we have talked about, distinguishes between a federal crime of fraud and a, sorry, a federal mail fraud crime and a state crime. Because in this case, it's the conveying of the information from point A to point B that I suppose you might see as part of the step. But the mechanism under which the conveyance takes place has to be, if you will, wire or mail in order for it to be a federal crime as opposed to there to have been a state crime. Otherwise, all of those transactions, otherwise there is no distinction. All right, thank you, counsel. Thank you. Thank you to all counsel. The case is argued and submitted for a decision by the court, and we are in recess until 9 o'clock a.m. tomorrow morning. Thank you.
judges: Zouhary, Goodwin, Rawlinson